Argued October 26, reversed and remanded November 24, 1965

# KNOX ET UX *v.* HANSON ET AL
### 408 P. 2d 76

*Joseph Larkin,* Redmond, and *Roy Kilpatrick,* Canyon City, argued the cause for appellants. With them on the briefs were Brewster, Copenhaver & Larkin and Ronald L. Bryant, Redmond.

*Gordon Wilson,* John Day, argued the cause and filed a brief for respondents.

Before McAllister, Chief Justice, and Sloan, Goodwin, Denecke, Lusk and Schwab, Justices.

SCHWAB, J. (Pro Tempore)

The plaintiffs, Horace and Barbara Knox, appeal from a decree interpreting share crop agreements they had entered into with defendants, H. M. and Fred Hanson. The principal parties are the plaintiff, Horace Knox, and the defendant, H. M. Hanson, and we hereafter refer to the parties in the singular.

Defendant Hanson owned a sheep ranch near Mitchell, Oregon, apparently worth in excess of $150,000. By virtue of a previous transaction involving Hanson, Knox and Knox's father, Knox had ac-

quired an undivided interest in the real property the value of which had been fixed at $20,000 as between the parties.

On October 1, 1961, Hanson and Knox became joint venturers in the operation of the ranch. An agreement executed that day provided that Knox would operate the ranch. Knox had no capital to put into the operation; Hanson was to provide the needed funds and was to be reimbursed out of Knox's share as the crops of wool, lambs and hay were sold. The proceeds from the operation were to be split sixty percent to Knox and forty percent to Hanson. All the ranch operating expenses were to be paid out of Knox's sixty percent share except for certain minor items which are not relevant here. Hanson was to have full control of the marketing of the crops and title was to remain in him until they were sold. The band of ewes was to be maintained and any loss of ewes was to be replaced out of the increase. The agreement provided that any disputes would be settled by arbitration.

The parties operated under this agreement for some seventeen months with Knox living on and running the ranch and Hanson advancing money for the expenses of the operation. By February 5, 1963, the parties realized they were in trouble. They had not made any money; the joint venture was indebted to Hanson in the sum of $19,933.97. On February 5, 1963, Hanson and his attorney went to see Knox and in the course of the meeting the parties apparently decided to liquidate the operation and to attempt to sell the ranch itself. At that time and place, Hanson's attorney drew the following memorandum agreement in long hand which the parties signed.

"This memo agreement made this 5th day of

Feb 1963 between H M Hanson & Fred Hanson herein called 'Hanson' & H. C. (Newt) Knox & Barbara Knox herein called Knox as follows:

"1. The Knox-Hanson farm share joint venture is indebted to Hanson at this date in the sum of $19,933.97.

"2. That the parties contemplate an early sale of the sheep, ewes bucks, lambs wool & hay. The ewes & bucks belong to Hanson. The lambs wool & hay belong to the Knox-Hanson partnership & the proceeds of partnership sales to apply against the Knox-Hanson debt accumulated to date of sale.

"3. As security to Hanson for any remaining debt Knox herewith assigns his $20,000.00 interest in the Roscoe Knox et ux & Norton contract sale contract dated June 8, 1961 to which the parties hereto were parties & Knox agrees to forthwith deliver Hanson a mortgage describing said property & securing this assignment of Knox's interest in said Cherry Creek Ranch.

"4. The parties agree forthwith to offer said Cherry Creek ranch for sale the proceeds to apply as follows:

"(First): In payment of any balance due to Hanson from the Hanson-Knox farm share operation

"(Second): To apply pro-rata to the payment of the parties investment in said Cherry Creek ranch, which investment is respectively Hanson $148,500 & Knox is $20,000.00. By Cherry Creek Ranch is meant, land bldgs & machy.

"(Third): The proceeds of any such sale after repayment to Hanson of the operating debt & the initial cost as above defined shall be split 50-50 between Hanson & Knox.

"5. Knox reserves the right to object to any sale for less than $175,000.00 gross. It being under-

stood of course that costs of sale are paid first before any payment to the parties hereto.

"6. Regarding a sale of ewes & lambs as pairs, the market price for slaughter lambs shall be deducted to ascertain the price being paid for ewes.

"7. Within the above framework the Hanson-Knox operating agreement for farm share operation dated Oct 1, 1961 shall continue on a month to month basis, and the terms shall be a part of this memo agreement.

"In witness whereof the parties have hereunto set their hands & seals this 5 day of Feb 1963.

/s/ H M Hanson

/s/ Horace G Knox

/s/ Barbara A. Knox
"

A month later Hanson refused to advance any more money and Knox turned the operation over to him. Hanson marketed the 1963 wool and lamb crops. Thereafter, Knox filed suit for an accounting. The trial judge abated the proceedings and appointed an arbitrator on Hanson's motion. The arbitrator made a report in which he made findings as to receipts and disbursements but refused to make an award because to do so required decision as to certain questions of law involving interpretation of the agreements between the parties. The parties stipulated that the amounts set forth in the arbitrator's report were correct and that the court might decide the legal issues; in effect, that the court might enter a decree based upon the arbitrator's findings of fact.

The issue presented here is whether in light of the 1963 agreement (1) the proceeds of crop sales were to go first to pay Hanson's advances and the re-

mainder, if any, divided between Hanson and Knox, (Knox's interpretation) or

(2) the proceeds of crop sales were to be apportioned per the 1961 agreement, i.e., forty percent to Hanson, sixty percent to Knox, with the money necessary to repay Hanson's advances coming out of Knox's sixty percent (Hanson's interpretation).

The trial court felt that the 1963 agreement was ambiguous. Accordingly, he considered the surrounding circumstances and in light of these construed the contract provisions he deemed ambiguous in favor of the position taken by Hanson. The result was a decree finding Knox indebted to Hanson in the amount of $14,015.16 and declaring this amount to be a lien on Knox's undivided interest in the realty by virtue of the provisions of paragraph three of the 1963 agreement. We find no ambiguity.

The report of the arbitrator shows that as of the date of the second agreement, February 5, 1963, Hanson had advanced $19,933.97 on account of the joint venture. It follows that the reference to the debt of the joint venture to Hanson as it appears in paragraph one and at other places in the 1963 agreement is to money advanced by Hanson in connection with the ranch operation.

The 1963 agreement contains seven paragraphs. The first three paragraphs deal directly with the parties' intent to liquidate the operation. Paragraphs four and five deal with the other intent of the parties to dispose of the ranch property. Paragraph six deals with a matter not relevant here. Paragraph seven in effect provides that until the share crop operation could be liquidated it would be continued on a month to month basis under the 1961 agreement as modified

by the 1963 agreement. The ranch property was not sold and we are concerned here only with that portion of the 1963 agreement dealing with the liquidation of the operation.

■■ Paragraph one recites the amount of money advanced by Hanson which constituted the debt of the joint venture to him. Paragraph two first states, "that the parties contemplate an early sale of the sheep, ewes bucks, lambs wool & hay." The ewes and bucks were the brood stock and the expressed intent to sell them indicates the intent of the parties to liquidate the operation. The next sentence first states, "the ewes & bucks belong to Hanson," and was clearly a recital of the ownership of these assets to show that when the brood stock was sold the total proceeds thereof were to go to Hanson. The rest of the sentence reads, "the lambs wool & hay belong to the Knox-Hanson partnership & the proceeds of partnership sales to apply against the Knox-Hanson debt accumulated to date of sale." This language is a clear and unequivocal departure from the provisions of the 1961 agreement which provided that the proceeds of the sales of partnership crops should be divided forty percent to Hanson and sixty percent to Knox, with all of the partnership costs coming out of Knox's sixty percent. The new language cannot be reasonably construed to mean anything but that when the crops were sold the receipts should be applied in toto against the debt, i.e., money advanced by Hanson. Since the language is clear we cannot concern ourselves with extrinsic evidence bearing on what the parties understood or intended or with whether the results were equitable.

■ After Knox turned the operation over to Han-

son, Hanson operated the ranch until he marketed the crops. The financial results were as follows:

| | | |
|---|---:|---:|
| Net receipts | | $35,502.56 |
| Advances by Hanson as of Feb. 5/63 | $19,933.97 | |
| Hanson's operating expenses after 2/5/63 | 15,413.43 | |
| Total advances by Hanson | | 35,347.40 |
| Net surplus | | $ 155.16 |

Apparently the parties, when they executed the 1963 agreement, did not contemplate that there would be an upturn in the fortunes of the joint venture which would result in the proceeds of the crop sales amounting to more than Hanson's advances as they made no provision for such eventuality in paragraph two. Since the 1963 modifications are silent on that point, the division of the small surplus is governed by the 1961 agreement. See paragraph seven of the 1963 agreement. Therefore, $93.10 of this amount is due Knox, plus $1,625 that he had expended in capital improvements, less $1,594 partnership receipts that he had retained. Thus there is no remaining debt but on the contrary a balance due Knox of $124.10 and Knox is entitled to retain his $20,000 interest in the real property.

■ Hanson argues that Knox has no standing to appeal to this court because ORS 33.340① gives a right of

---

① "Whenever no objection is made to the entering of judgment after award, judgment shall be entered according to the award and shall have the force and effect of a judgment obtained in a court of record after default, but whenever any judgment

appeal from judgment entered on the arbitrator's award only if exceptions to the award are made in writing on grounds prescribed by ORS 33.320 and in the manner provided by ORS 33.310. He would be correct if the arbitrator in this case had made an award, but he did not. The arbitrator, who was an accountant, rendered a report which he captioned "Arbitrator's Findings and Award." However, the body of his report consists of "findings of fact" and "legal issues" and concludes with this statement: "The undersigned expressly makes no decision as to said legal issues and makes no award herein because the resolution of these issues resolves (sic) complicated interpretation of the agreements between the parties." The trial judge suggested and the parties agreed that it would be pointless to refer the matter back to the arbitrator. Both agreed to accept as correct the findings of fact as made by the arbitrator and to have the court proceed with the case from that point. By this stipulation they abandoned their right to have the controversy resolved by arbitration. The court then took testimony and thereafter entered its decree. The plaintiff had the right to appeal from the decree in the manner provided by the appellate code, ORS Chapter 19.

Reversed and remanded for entry of a decree in accordance with this opinion.

---

is entered after objection on the part of any party by the order of such court, such judgment shall be subject to appeal to the higher courts in the manner provided by law for taking appeals to such courts. * * *"