Argued July 11, 1973, reversed and remanded September 26,
motion for late filing of petition for rehearing denied
November 1, 1974

## ANDREWS, *Appellant, v.* NORTH COAST DEVELOPMENT, INC. ET AL, *Respondents.*
526 P2d 1009

*Eugene E. Feltz,* Portland, argued the cause for appellant. On the briefs were Casey, Palmer & Feltz and James T. Dunn.

*Lawrence M. Dean,* Astoria, argued the cause for respondents. On the brief were Macdonald, Dean, McCallister & Snow.

Before O'CONNELL, Chief Justice, and McALLISTER, DENECKE,* HOLMAN, HOWELL, and BRYSON,* Justices.

McALLISTER, J.

Plaintiff brought this suit to enjoin defendants from obstructing a view easement appurtenant to her Gearhart condominium.

---

*Denecke, J., and Bryson, J., did not participate in the decision of this case.

Plaintiff owns a top story unit on the south end of the Pacific View Condominium near Gearhart which contains a window in the south living room wall from which there was at the time she purchased the unit a view to the south of Tillamook Head and some of the beach adjacent to Seaside. On the property immediately south of Pacific View, owned by defendant Hotel Gearhart, Inc., defendants North Coast Development, Inc., North Coast Management, Inc., and W-P Development, Inc., constructed Tillamook House, a large multi-story condominium. The northwest corner of this building partially obstructed the view from plaintiff's south window, which obstruction allegedly violates the easement claimed by plaintiff. There is no doubt that plaintiff owned a view easement, which was created by two separate deeds. The dispute is over the scope of the easement.

It will be helpful to relate the chronological development of these parcels of property. Originally, Hotel Gearhart, Inc., owned all the real property involved in this suit. In recent years it has sold several parcels which have been developed by the purchasers into condominium projects.

In December, 1966, Hotel sold to W. C. Bauman a parcel on which was built the Pacific View Condominium and is the dominant estate to which the view easement is appurtenant. Hotel retained a parcel on which the old Gearhart Hotel was then standing and on which Tillamook House later was built which is the servient estate in this dispute.

In conveying the dominant estate to Bauman, two deeds were executed by Hotel. The first deed, dated December 6, 1966, described the property con-

veyed by metes and bounds and granted a view easement in the following language:

"Together with the right to the unimpeded view over and across that piece of land owned by the Hotel Gearhart South and West of the above described property situated in the City of Gearhart."

The second deed, dated December 16, 1966, was given because Bauman's lender wanted the easement reworded. It described the easement as follows:

"* * * an easement to an unimpeded view from the windows of a building to be constructed on [the dominant parcel]. Said view easement is to run over and across the following described land situated in the County of Clatsop and State of Oregon, bounded and described as follows; to-wit: * * *"

The servient estate was then described by a metes and bounds description.

In July, 1967, Hotel and Bauman entered into a declaration of Pacific View Condominium, which described the real property and the view easement in the language of the December 6, 1966, deed. This declaration was required by the Oregon Unit Ownership Law, ORS 91.505 to 91.675 and especially by ORS 91.525 and 91.530. After Pacific View was built, Bauman deeded to plaintiff's predecessor the unit now owned by plaintiff. This deed described the unit by reference to the recorded declaration of Pacific View Condominium. In 1971, plaintiff purchased the unit and received a deed which also described the unit by reference to the declaration.

When Pacific View was built and plaintiff bought her unit, the Gearhart Hotel was still standing. In the spring of 1972 the Hotel was razed and about July 1, 1972, construction of Tillamook House was commenced. On July 11, 1972, plaintiff notified de-

fendants in writing of her claim to a view easement as described by the December 6, 1966, deed and demanded that construction cease immediately. During the next two to three weeks there was an exchange of correspondence and telephone calls between various representatives of defendants and plaintiff and her attorney culminating in a meeting in Portland on August 2, 1972, between plaintiff and two officers of defendants.

At the Portland meeting plaintiff tentatively agreed to accept a unit in Tillamook House in exchange for her Pacific View unit if she was satisfied with the view she would have from the new unit. She testified, however, that she told the men she wanted to wait and see "how the building was going to be looking" before she could definitely accept the exchange of units as a settlement of her claim. Later, while plaintiff was apparently out of the state, there was another exchange of letters between plaintiff's attorney and defendants. On September 12, 1972, plaintiff's attorney notified defendants that their settlement offer was not acceptable to plaintiff and that she intended to start legal proceedings. On September 22 the complaint in this suit was filed. Plaintiff's motion for a temporary injunction was denied on October 16. This suit was tried on November 2, and on December 12 a decree was entered dismissing plaintiff's suit. The trial court held that the intent of the parties to the two original deeds, as shown by parol evidence, was to grant a view easement out of the west window of the Pacific View Condominium looking toward the southwest around to the northwest.

We must first consider whether the court erred in admitting parol evidence of the original grantor

and grantee as to the scope of the easement. When parties have reduced the terms of their agreement to writing, other evidence concerning the terms is inadmissible except for certain purposes. Such evidence is admissible to explain a mistake or ambiguity in the writing, or to show the circumstances under which the agreement was made. ORS 41.740.

■ Defendants contend that both deeds granting the easements are ambiguous. Turning first to the December 6 deed, defendants claim that the phrases "South and West" and "situated in the City of Gearhart" are each susceptible of at least two interpretations.

We find no ambiguity in the phrase "South and West." It is well established that the words "north," "south," "east," and "west" mean *due* north," etc., in the absence of other words qualifying their meaning. *E. E. McCalla Co. v. Sleeper,* 105 Cal App 562, 288 P 146, 148 (1930); *Livingston Oil & Gas Co. v. Shasta Oil Co.,* 114 SW2d 378 (Tex Civ App 1938); *Waldmann v. Hoechst,* 487 SW2d 541 (Mo 1972). Extrinsic evidence is admissible here only to show what piece of land owned by Hotel lies "South and West" of the dominant estate. *Bloech v. Hyland Homes Co. et al.,* 119 Or 297, 305, 247 P 761 (1926). The record shows that Hotel owned property which consisted of a large rectangular block due west of Pacific View between it and the ocean, a larger rectangular block due south of Pacific View (the site of the Gearhart Hotel and Tillamook House), and a narrow diagonal strip connecting these sections. There is nothing ambiguous in the phrase "South and West" as applied to describe this servient estate.

■ The phrase "situated in the City of Gearhart"

could, arguably, apply to either the dominant estate or the servient estate. Therefore, extrinsic evidence is also admissible here to show which of these two estates is within the city. The evidence shows that none of the Pacific View property is so situated. Since this phrase, if applied to Pacific View, is inconsistent with the metes and bounds description of the Pacific View property, it will be ignored because the particular description controls a general one. ORS 42.240. The evidence also shows that only a small strip along the south edge of Hotel's property is within the city. Thus the phrase applied to Hotel's property is also inconsistent because there is no land owned by Hotel that is both "West" of Pacific View and within the city. The only possible application of the phrase to Hotel's property would give plaintiff a wider easement, more to the southeast, than plaintiff is presently claiming, and defendants obviously do not urge this construction. We find that the phrase "situated in the City of Gearhart" is inapplicable to either the dominant or the servient estate and therefore can be treated as surplusage.

■ Defendants also contend that the phrase in the December 16th deed reading "from the windows of a building to be constructed" should be construed to refer to a specific building, the plans of which were known to grantor and grantee at the time this deed was executed. We note that the deed does not refer to any plans and that no plans were attached to it. We think the language of the deed applied to the building as actually constructed, which had windows on the south end which afforded a view across the described servient estate. The servient estate was described by metes and bounds and if the parties had intended to limit the view easement to the south over the Hotel

Gearhart site they presumably would have so provided in the deed.

10. After consideration of all the evidence we find that plaintiff does have a view easement to the south as extensive as the view she had when the Hotel Gearhart was still standing. We further find that after Tillamook House was constructed plaintiff's view to the south was substantially restricted so that she could no longer see Tillamook Head and the beach at Seaside from her south window. These findings require us to next decide on a remedy appropriate to the facts of this case.

 It is a general rule that a mandatory injunction is a proper remedy to compel an adjoining landowner to remove an encroachment on neighboring property. *Tauscher v. Andruss,* 240 Or 304, 308, 401 P2d 40 (1965); Annotation 28 ALR2d 679, 686. We have concluded, however, that a mandatory injunction would not be a proper remedy in this case. One reason is the conduct of plaintiff in expressly or by clear implication permitting defendants to proceed with construction until she could determine whether she would agree to an exchange of her unit in Pacific View for a unit in Tillamook House with a view to the south that was important to her.

As we have related, plaintiff's attorneys, on July 11, 1972, wrote defendants notifying them of plaintiff's claim to a view easement as described in the December 6, 1966 deed and demanding that defendants immediately stop all construction of Tillamook House. However, plaintiff did not persist in her demand that defendants cease all construction on the adjoining property. On or about August 1, 1972, Mr. Vaughan, from whom plaintiff had purchased her unit,

called and offered to repurchase the unit, including some permanent improvements which had been made by plaintiff. Plaintiff testified:

"Q Mrs. Andrews, previously we'd just—you'd just indicated to us that you had discussions with Mr. Orrico and Mr. Kelly and that you had been contacted by Mr. Vaughan, the individual that sold you the condominium prior to that time. Do you recall approximately when you were contacted by Mr. Vaughan?

"A A day or two before I was contacted by Mr. Kelly.

"Q All right. And did Mr. Vaughan contact you regarding the letter that your attorney had written to these people?

"A Yes.

"Q And would you tell the Court what your discussion was with Mr. Vaughan?

"A Mr. Vaughan called me and he offered to buy the condominium back.

"Q And was there also some discussion about also paying you for some improvements that had been made?

"A There were some permanent improvements that were made that I could not have taken with me—

"Q Right—

"A —like painting on the walls and that type of thing.

"Q I believe some $1,600.00 worth of improvements?

"A Yes."

According to plaintiff, when she met on August 2, 1972, with the two representatives of defendants, Mr. Kelly and Mr. Orrico, they offered to exchange a

unit in the new Tillamook House for her unit in the Pacific View. Concerning that offer she testified:

"Q After meeting Mr. Kelly in August, 1972, did you enter into any agreement with him for an exchange of an apartment?

"A We discussed the possibility but I told him that I had to see more before I could make up my mind. The plans, as well as I could read them, looked as though they might be quite interesting and I hoped that they would be, but what happened was that the location of the building on the ground wasn't what I had anticipated.

\* \* \* \* \*

"Q In other words, they had to progress with the building before you could determine whether or not you wanted the other unit?

"A Yes."

She also testified:

"A They made a suggestion that I might be willing to trade if I didn't want to sell, was the view I got.

"Q All right. My question is: Did you tell him that you did not intend to stop the project or delay the project, that you were willing to work out some sort of an agreement?

"A If we could work out an agreement.

"Q All right. Did you tell—

"MR. FELTZ: Excuse me. She's answering the question.

"MR. DEAN: Continue, if you have to.

"A Yes. If we could agree on something, but, of course, I hadn't seen anything, any plans or anything, and when I did see the plans, they were —I couldn't read them very well so I said further that before I could make any decisions of any kind I'd have to have—to see how the building was going to be looking.

"Q All right. Did you not tell them that it was—at the time you talked to them it was not your intention to delay or to prevent the construction of this building?

"A If it were not necessary. I don't like to go to court.

"Q Well, when you were talking to them, did you tell them that you didn't intend to delay or prevent the construction of this building? Did you add, 'if it were not necessary'?

"A Right."

Later she also testified as follows:

"Q I see. Now, you knew they were continuing with the construction—

"A Right.

"Q —while this was going on? Did you in your conversation with them tell them that they should stop constructing until you reached an agreement?

"A I told them that when I found out that the unit that I thought might be a relative unit to the one that I now own, when I saw it, went and looked at it, at the view from those units, they were entirely different."

The second reason why we think a mandatory injunction would not be appropriate in this case is the great disproportion between the injury to plaintiff and the damages which would be sustained by defendants if they were required to remove a substantial portion of Tillamook House to restore plaintiff's view to the full extent enjoyed when she bought her unit. Concerning the depreciation in the value of her unit plaintiff testified:

"Q Did you at any time tell them that if they would pay you $10,000.00 that that would be satisfactory?

"A I said that if I were going to retain the unit I now own that I would want to be paid

$10,000.00 because I feel that the property has depreciated $10,000.00 by the new building."

Although the evidence does not show the exact cost of restoring the view it does appear that the cost would be several hundred thousand dollars.

After considering plaintiff's conduct in holding out to defendants the hope that she would be satisfied with an exchange of units or, as an alternative, payment of $10,000 and either expressly or by implication permitting construction to continue for about two months and the fact that removal of a part of Tillamook House would cost defendants several hundred thousand dollars we conclude that mandatory injunction would not be an equitable remedy in this case.

On the other hand, we find that plaintiff is entitled to damages on account of the encroachment and accept her testimony that her loss amounted to $10,000. We therefore reverse the decree of the trial court and remand this case for the entry of a decree awarding plaintiff damages in the sum of $10,000, together with her costs and disbursements in this court and in the court below.