Argued and submitted June 28, affirmed in part, reversed
in part and remanded with instructions November 26, 1979

# SOUTHWEST FOREST INDUSTRIES, INC., et al,
*Respondents,*

*v.*

# VANPLY, INC., et al,
*Appellants.*

## (No. A7705-06448, CA 10822)

602 P2d 1113

[347]

[348]

James H. Clarke, Portland, argued the cause for appellants. With him on the briefs were Spears, Lubersky, Campbell & Bledsoe, John P. Bledsoe and Charles J. Pruitt, Portland.

Manley B. Strayer and Peter Jarvis, Portland, argued the cause and filed the brief for respondents.

Before Thornton, Presiding Judge, and Buttler and Joseph, Judges.

BUTTLER, J.

**BUTTLER, J.**

Defendants appeal from a judgment entered by the circuit court declaring the parties' rights, under a contract for the sale of a business, concerning indemnity for liability for defective products produced by that business. We affirm in part and reverse in part.

The parties negotiated in late 1971 for the purchase by plaintiffs (SWF) from defendants (Vanply) of all of Vanply's Oregon plywood and veneer business and related operations, together with all assets and properties used in connection with that business. Those negotiations culminated in the agreement which is the subject of this action for declaratory relief. That contract was executed on March 29, 1972, had an effective date of January 31, 1972, and a closing date of July 31, 1972. After the execution of the contract, and pursuant to its terms, Vanply continued to manufacture and sell plywood and generally to operate the business for the benefit of SWF until the closing date, at which time all of Vanply's Oregon employees became employees of SWF.

This controversy arose from the manufacture by Vanply prior to July 31, 1972, of a type of exterior plywood siding that was faced with veneers of certain Philippine hardwoods collectively known as "lauan." Vanply began producing lauan plywood siding in late 1969 and had produced approximately 30 million square feet by the closing date, at which time production ceased and all of Vanply's inventory was transferred to SWF.

Manufacturers of lauan plywood siding began receiving delamination complaints in 1971. Vanply received one or two claims in late 1971 and continued to receive them during the first six months of 1972. By 1973, the delamination problem had become a major industry-wide problem. According to the American Plywood Association, the problem was caused by using a species of lauan, indistinguishable from other acceptable species, which produced inferior glue bonds

[349]

not detectable by sampling tests then in use, but which led to severe delamination after exposure to the elements.

The general industry delamination problem and the possibility of claims against Vanply was discussed by the parties during their contract negotiations and resulted in the following indemnity clauses being included in the contract:

"8.2 *Additional Indemnities of SWF and Southwest.* In addition to all other indemnities of SWF and/or Southwest herein, SWF and Southwest, jointly and severally, agree to and do hereby indemnify and agree to defend and hold Vanply and Skelly, and each of them, and their respective successors and assigns, harmless from and against all claims, liabilities, damages and expense of every kind and character, known and unknown, resulting from or relating to
"* * * * *

"(3) Product liability with respect to products of the Oregon Operations produced and/or sold on or prior to the Closing Date which is not within the insurance coverages specified in SWF's notice to Vanply pursuant to Subparagraph (b)(5) of Section 4.1 hereof;

"(4) The ownership, management or use of the Property after the Closing Date;

"(5) The business, operations and activities of the Oregon Operations after the Closing Date; and

"(6) The products of the Oregon Operations produced after the Closing Date.

"8.3 *Additional Indemnities of Vanply and Skelly.* In addition to all other indemnities of Vanply and/or Skelly herein, Vanply and Skelly, jointly and severally, agree to and do hereby indemnify and agree to defend and hold SWF and Southwest, and each of them, and their respective successors and assigns, harmless from and against all claims, obligations, liabilities, damages and expense of every kind and character, known and unknown, resulting from or relating to (i) the ownership, management or use of the Property on or prior to the Closing Date, (ii) the business, operations and activities of the Oregon Op-

[350]

erations on or prior to the Closing Date, and (iii) the products of the Oregon Operations produced and/or sold on or prior to the Closing Date, other than:
"* * * * *

"(3) Product liability which is not within the insurance coverages specified in SWF's notice to Vanply pursuant to Subparagraph (b)(5) of Section 4.1 hereof; and
"* * * * *."

Section 4.1(b)(5) referred to in Sections 8.2(3) and 3(3) provides:

"4.1 *Conduct of Oregon Operations Pending Closing.*
"* * * * *

"(b) Vanply and Skelly, jointly and severally, covenant and agree with SWF and Southwest that from the date of this Agreement until the Closing (except as otherwise contemplated by this Agreement or consented to or approved by SWF in writing):
"* * * * *

"(5) They will carry insurance with respect to such risks and in such amounts as shall be specified from time to time by SWF in writing, and in the event any of the assets or properties included in the Property shall be damaged, lost or destroyed prior to the Closing, will promptly notify SWF and Southwest thereof, will not settle any claim with respect thereto without the prior written consent of SWF, and will deposit and maintain all insurance proceeds received prior to the Closing as a result of any such damage, loss or destruction in a special bank account from which withdrawals shall be made only with the prior written approval of SWF;
"* * * * *."

The contract also provided in section 3.1(18) that, cept as stated in the disclosure schedule delivered to VF by Vanply on March 29, 1972, Vanply had (and, the closing, would have) no knowledge of customer ims or complaints "of a substantial nature (individ-lly or in the aggregate) * * * based upon any alleged fect in the products sold or the services rendered" by nply's Oregon operations. The disclosure schedule

which was delivered by Vanply specifically referred to the delamination problem in the industry and stated that until procedures were put into effect to eliminate the delamination it was "to be expected that claims may be received with respect to such siding produced at the Oregon mills." At no time prior to closing did Vanply notify SWF of any specific delamination claims pending, and there is no evidence as to the number or dollar amount of claims pending at the time of closing.

Pursuant to subparagraph (b)(5) of section 4.1 of the contract quoted above, the parties exchanged information as to existing product liability insurance coverage, and the parties agreed upon and obtained additional coverage.

Following the close of the sale, delamination claims were received by SWF relating to defective plywood. Some claims were addressed to Vanply at its former address and concerned plywood bearing the Vanply trademark (plywood manufactured prior to the July 31 closing). In other instances the plywood had been manufactured by SWF following the closing and bore its trademark. Most of the claimants were former customers of Vanply who became customers of SWF. SWF investigated and settled the claims; where the defective plywood bore Vanply's trademark, SWF sought reimbursement from Vanply.

On May 1, 1973, the parties established procedures to settle claims arising against Vanply[1] whereby Vanply received delamination claims, either through SWF

---

[1] That agreement stated, in pertinent part:

"Based on our discussion of May 1, 1973 in respect to the captioned matter, effective with the date of this memorandum we mutually agree to the following procedure for effecting settlement of such claims:

"1. SWF Plywood Company will notify Vanply when SWF has been advised by the customer that a claim possibly exists for defective product applicable to the time per [sic] in question.

"2. SWF will furnish Vanply copies of the appropriate sales in-

r directly from its former customers, which Vanply hen accepted for processing and settled, or attempted b settle, if satisfied that the plywood bore the Vanply rademark. Vanply also reimbursed SWF for some of he claims which SWF had settled and, where products f both companies were involved, the parties divided he cost of settlements in the proportion that products f each were involved in the claim.

Since the closing Vanply has paid a total of over 770,000 for such claims. At least $65,000 of this mount involved plywood sold after January 31, 972—the effective date of the contract. Some of the aims simply involved replacing the defective siding, hile others required additional work to repair damge to other property caused by the defects. The pares did not distinguish between the two types of aims.

In 1976, Vanply for the first time contended that WF was obligated under section 8.2 of the contract to demnify Vanply for all "product liability" claims d for all liability incurred in replacing defective oducts manufactured from January 31, 1972, to the te of closing—July 31, 1972. SWF disagreed, conding that Vanply's indemnity claims are barred by ilure to assert them within two years, as required by ction 12.2 of the contract;[2] and that, except to the

---

voices, correspondence to or from the customers, and any other information which might be useful in assessing the merit of the claim.

"3. If a physical inspection of the defective material is warranted, Vanply will be given the opportunity to assist SWF personnel in making the inspection.

"4. Upon effective settlement of the claim, Vanply will issue and direct the remittance to the customer."

[2] Section 12.2 states:

*"Representations, Warranties and Indemnities of SWF and Southwest.* All of the representations, warranties, indemnities, covenants and agreements made by SWF and/or Southwest (jointly or severally) in this Agreement or pursuant hereto shall be continuing and shall survive the Closing and the purchase and sale of the Property pursuant

extent claims arising from sales of plywood sold during the interim period (January 31 to July 31) exceeded the amount of insurance specified by SWF pursuant to section 4.1(b) of the contract, such claims were the sole responsibility of Vanply. SWF commenced this action for a declaration of the rights and obligation of the parties under the contract.

The threshhold question is whether the relevant provisions of the agreement are clear and unambiguous. If they are, parol evidence is not admissible, ORS 41.740,[3] and the construction of the contract is a question of law for the court. *Henry v. Harker,* 61 Or 276, 290, 118 P 205, 122 P 298 (1912). Each of the parties approaches the problem under the pain and pleasure principle: any provision which hurts is ambiguous and does not mean what it says, but a provision which feels good is unambiguous and means exactly what it says. While the trial court stated that the agreement was "clear" and that the provisions would "speak for themselves," extrinsic evidence was admitted to show what the parties intended, and the court's findings are based in part on the "intended" meaning.

---

hereto and any investigation at any time made by or on behalf of Vanply or Skelly. Notice of any claim of any kind by Vanply or Skelly against SWF or Southwest with respect to the transactions covered by this Agreement must (unless a shorter period of limitation is provided by applicable law) must [sic] be delivered to SWF within two (2) years after the Closing Date and any such claim which is not delivered to SWF within such period of time shall not be allowed.

[3] ORS 41.740 provides:

"When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing, except where a mistake or imperfection of the writing is put in issue by the pleadings or where the validity of the agreement is the fact in dispute. However this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in ORS 42.220, or to explain an ambiguity, intrinsic or extrinsic, or to establish illegality or fraud. The term 'agreement' includes deeds and wills as well as contracts between parties."

We conclude that the agreement is clear and unambiguous, and view the issues presented as being imarily questions of law for the court to decide. We nsider the scope of our review to be as in an action at w. *Lindsey v. Dairyland Insurance Co.,* 278 Or 681, 5 P2d 744 (1977).

The only language which might need clarification he phrase "product liability" as used in sections 8.2 d 8.3 of the agreement. The parties appeared to be in agreement on the meaning to be attached to that nguage, and evidence was adduced with respect reto. That was permissible, notwithstanding the rol evidence rule. *Bernard v. First Nat'l Bank,* 275 145, 550 P2d 1203 (1976).[4] On appeal, however, t disagreement seems to be semantic, with apparagreement in the briefs that the phrase means: ims for damages based upon injury to the person or er property of third parties, regardless of the legal ories upon which the claims are made,[5] but does not lude claims for delaminated plywood where no nage to persons or other property results. Where plywood has been incorporated into and damages a ger structure, the actual cost of replacing the defece product (resulting in what is characterized as a lacement claim), as distinct from the overall cost of air, is not within the contract meaning of "product ility." Once the meaning of that phrase is determed, the remaining language in the relevant con-

---

In *Bernard v. First Nat'l Bank,* 275 Or 145, 154-55, 550 P2d 1203 ), the Court said:

"* * * The question involved, however, is the meaning attached by he parties to the words 'per annum.' Ascertaining the meaning of nguage employed in a writing is a matter of interpretation. It is well ttled that the parol evidence rule does not exclude evidence offered to id the court in its interpretation of the language chosen by the parties. * *" (Citations omitted.)

The trial court found that the parties had intended the term "products ty" as used in section 8.2 and 8.3 be understood as meaning "strict ty" for injury to the person or damage to or loss of property of buyers rd persons caused by the defective products of Vanply and did not d the term to include liability for losses by buyers of a solely economic e resulting where a product did not perform as expected or intended.

tract provisions is clear and unambiguous, and the trial court should not have considered extrinsic evidence to vary the plain meaning of that language.

With respect to the indemnification requirements of sections 8.2 and 8.3, SWF is required to indemnify Vanply for all claims "resulting from or relating to * * * product liability with respect to plywood produced and/or sold on or prior to the Closing Date * * *," to the extent that those claims are not within the insurance coverages which SWF required Vanply to obtain pursuant to section 4.1(b)(5). That language in no way limits the obligation to indemnify only to product liability claims resulting from defective products which were manufactured and/or sold *after* January 31, 1972, but before closing. The contract is drawn meticulously and articulately, and if the parties had intended such a limitation, they would have said so. Since the language is clear, we cannot vary it. *See Knox v. Hanson,* 242 Or 114, 408 P2d 76 (1965).

The effect of those sections is that SWF assumed liability for product liability claims not within the insurance coverages, with the right to specify insurance to be purchased by Vanply (which SWF did), no matter when the product was manufactured or sold.[6] On the other hand, Vanply agreed to assume liability for non product liability claims, *i.e.* those involving replacement of the defective plywood, with respect to products produced and sold prior to closing.

Vanply concedes that liability with respect to products manufactured and sold prior to January 31, 1972, but argues that "replacement claims" relating to products produced and sold during the interim period between January 31, 1972, and the closing date of the contract are the responsibility of SWF. This contention is based upon those sections of the contract which provide generally that Vanply is operating the

---

[6] Under section 8.2(6) of the contract, SWF agreed to indemnify and hold harmless Vanply for all claims arising from products produced after closing.

[356]

usiness for the benefit of SWF during that period and at SWF is to bear all costs of the business incurred uring that period. Vanply claims that the cost of placing defective plywood produced or sold during at period is a cost of operating the business. We do t read the contract that way, especially in light of her sections which require the parties to draw up a atement at closing listing such costs. It may be that th respect to claims that were made and adjusted d which would, under generally accepted accounting inciples, be so treated, the effect would be to put the ss on SWF. But we conclude that the provisions lied on clearly do not impose independent substan-e liability on SWF for any claim asserted after sing.

There is, however, a significant limiting factor on VF's liability for product liability claims: section .2 provides that "Notice of any claim of any kind by nply * * * against SWF * * * with respect to the nsactions covered by this Agreement * * * must be ivered to SWF within two (2) years after the Clos-g Date and any such claim which is not delivered to VF within such period of time shall not be allowed." nply contends that this section does mean what it ys, arguing that it does not apply to such claims cause they are third party claims and therefore are claims "with respect to the transactions covered by e] Agreement." That such a view is mistaken is dent from the title of section 12.2 of that agree-nt. "Representations, Warranties and *Indemnities* SWF and Southwest." Also, section 8.2, which cov- indemnification for third party claims, is a trans-ion covered by the agreement.

We view the provision as clear and unambiguous, l to mean exactly what it says. We agree with the al court that Vanply, in order to obtain indemnifica-n, was required to give notice to SWF that it imed a right of indemnity with respect to specified ms within the time required by section 12.2. It tters not that SWF may have been generally ap-

[357]

prised that there were product liability claims afloat. The contract contains a specific procedure for Vanply's right to assert indemnification from SWF; it is clear and it must be followed strictly because we conclude that it provides an absolute cut-off date for a liability which is unusual for a purchaser of a business to assume.

The trial court also concluded that the parties' agreed settlement procedures constituted a practical construction of the contract and bars Vanply from now claiming a different meaning was intended. Those procedures, as set forth in the May 1, 1973 letter merely simplified the manner in which claims were to be received and processed. The letter agreement (note 1, *supra)* contains no language inconsistent with the contract. The fact that Vanply paid many claims without claiming indemnity against SWF, in the absence of ambiguity, a claim of estoppel or a claim that the contract was modified thereby, is nothing more than mistaken performance by Vanply. *In re Chicago & E. I. Ry Co.,* 94 F2d 296 (7th Cir 1938);[7] 3 Corbin, Cont-

---

[7] In that case the Court said:

"It is said that the conduct of the parties prior to 1926, whereby they excluded the capital stock tax from working expense, is of material weight in the determination of what the parties intended. As we recognized in Chicago & Western Indiana R. Co. v. Chicago & Eastern Illinois R. Co., supra, in case of ambiguity, the practical construction given by the parties to the contract over a period of years is persuasive. But when the contract is clear, the fact that the parties followed a different plan cannot work a revocation of the plain agreement. * * * The intention of the parties must be found in the language used to express such intention; and if the court finds as a matter of law that the contract is unambiguous, evidence of the intention and acts of the parties plays no part in the decision. The conduct of the parties may fix a meaning to words of doubtful import. It may not change the terms of the contract. Brainard v. New York Central R. R. Co., 242 N. Y. 125, 151 N.E. 152, 45 A.L.R. 751; Restatement of the Law of Contracts, § 235(e).

"If by mistake the parties followed a practice in violation of the terms of the agreement, the court should not perpetuate the error. Prall v. Bruckhartt, 299 Ill. 19, 132 N.E. 280, 18 A.L.R. 992; Union Tank Line Company v. Wright, 249 U.S. 275, 39 S. Ct. 276, 63 L. Ed. 602; Union Tank Car Co. v. McKnight, 7 Cir., 84 F.2d 421." 94 F2d at 299-300.

cts, 259-60, § 558 (1960).[8]

We have concluded that the relevant contract provisions are not ambiguous, and SWF has not asserted an estoppel or contended the contract was modified by the settlement procedures, but relies on that evidence as showing the intention of the parties to resolve an ambiguity. Accordingly, we hold that the trial court erred in its conclusion that the conduct of the parties constituted a practical construction of the contract.

Finally, we hold that the trial court's conclusion that Vanply breached its representations and warranties[9] by failing to inform SWF at closing of delamina-

---

[8] Corbin states:

"One of the parties may carelessly make a wrong interpretation of the words of his contract, or may perform more than the contract requires (as reasonably interpreted independently of his performance). In some such cases he should be entitled to a restitutionary remedy, instead of being bound to continue an erroneous performance. The other party should never be permitted to profit by such a mistake unless he can establish an estoppel by proving a material change of position made in good faith. The rule as to practical construction does not nullify the equitable rules with respect to performance by mistake." 3 Corbin, Contracts 259-60, § 558 (1960).

[9] The representations and warranties referred to by the court are found paragraphs 13, 18, and 23 of section 3.1:

"(13) The mills, plants, facilities, structures, buildings, building equipment, construction in progress, machinery, equipment, appliances, apparatus, motor vehicles, and leasehold improvements which constitute a part of the Property are in good working order and condition and not in need of repairs or replacement except for normal and routine maintenance (excluding replacements which although not required might be considered desirable for purposes of plant modernization), and said mills, plants, facilities, machinery and equipment are capable of and are producing sound and merchantable products.

"(18) Except as set forth in the Disclosure Schedule, neither Skelly nor Vanply has any knowledge of any claims or complaints of a substantial nature (individually or in the aggregate) against Vanply which have been asserted by any of its customers based upon any alleged defect in the products sold or the services rendered by the Oregon Operations or any failure of performance by it with respect to its Oregon Operations.

"(23) No representation or warranty by Vanply or Skelly in this Agreement nor any statement or certificate furnished or to be furnished by or on behalf of Vanply or Skelly pursuant to this Agreement or in

tion claims received prior to closing is without support in the record. Paragraph 18 of section 3.1 is the only representation pertinent to the delamination claims. It states that Vanply has no knowledge of claims of a *substantial* nature, individual or in the aggregate. The disclosure schedule described the emerging problem of delaminated lauan siding and stated that "it is to be expected that claims may be received with respect to such siding produced at the Oregon mills." This put SWF on notice of future claims. Furthermore, there was no evidence of the size or number of any claims pe., ding against Vanply at the time of closing, much less that they were "substantial" individually or in the aggregate. In the absence of such evidence there is no support for the court's conclusion.

In summary, we hold that SWF is obligated to indemnify Vanply for all product liability claims relating to products produced or sold prior to July 31, 1972, to the extent that those claims exceed the insurance coverages specified in section 4.1(b)(5) and to the extent that Vanply notified SWF of its claim of indemnity with respect to those claims prior to July 31, 1974. Vanply is liable for all "replacement claims" for all products produced and sold prior to July 31, 1972. SWF is responsible for all claims, no matter what their nature, relating to products manufactured and/or sold after July 31, 1972.

All other portions of the trial court's findings and conclusions not inconsistent with this opinion are affirmed. We remand for the entry of a new judgment consistent with this opinion.

Affirmed in part, reversed in part and remanded with instructions.

------

connection with the consummation of the transactions herein contemplated contains or will contain any untrue statement of a material fact or omits to state or will omit to state any fact necessary in order to make the statements herein and therein not misleading."