**HOSOKAWA MICRON (USA) INC., Plaintiff,**

v.

**Samuel G.N. DUNCAN, Defendant.**

**No. 85 Civ. 9420 (WCC).**

United States District Court, S.D. New York.

April 28, 1987.

---

Hughes Hubbard & Reed, New York City, for plaintiff; Steven A. Hammond, Matthew Dixon, of counsel.

Summit Rovins & Feldesman, New York City, for defendant; Ira G. Greenberg, of counsel.

WILLIAM C. CONNER, District Judge.

Plaintiff Hosokawa Micron (USA), Inc. ("Hosokawa") has moved for summary judgment, pursuant to Rule 56 Fed.R. Civ.P., on the ground that it has fulfilled its contractual obligations to defendant Samuel G.N. Duncan ("Duncan"). Defendant Duncan has opposed this motion asserting that there are genuine issues of material fact as to whether: (1) Hosokawa, the successor to U.S. Filter Systems Inc. ("USFS"), breached its contractual duty by refusing to provide additional funding to Sonodyne Industries, Inc. ("Sonodyne"); and (2) USFS breached its contractual duty by failing to offer to resell its Sonodyne shares to defendant and his fellow former shareholders prior to the acquisition of the stock of USFS's parent company by Hosokawa Micron Corporation ("Hosokawa Japan"). For the reasons set forth below, Hosokawa's motion for summary judgment is granted in part and denied in part.

## Background

In 1978, Thomas E. Lindahl ("Lindahl") and Robert Gray ("Gray") formed a corporation called Sonodyne Industries, Inc. ("Sonodyne"). Sonodyne was formed in order to exploit a technology developed by Gray for the drying of organic material. Sonodyne was initially funded by Gray's contribution of the drying system and Lindahl's contribution of capital. Gray and Lindahl each had an equity interest in Sonodyne with Lindahl's wife owning a token interest.

Gray and Lindahl, in addition to being stockholders in Sonodyne, comprised the senior management of the corporation. In 1979, defendant Duncan became a non-paid sales consultant to Sonodyne. After serving in that capacity for approximately a year, Duncan was appointed Sonodyne's vice-president of marketing and acquired an equity interest in the corporation by making a capital contribution.

From 1980 to 1983, Sonodyne lost money at an accelerating rate. To meet operating expenses, the corporation obtained loans and utilized a $1.3 million line of credit arranged by Gray's brother. Lindahl personally guaranteed some of those loans to Sonodyne. By 1983, the shareholders determined that the company needed more money in order to survive (Lindahl Deposition at 31–32). Evidently Sonodyne's options were limited, however, because the corporation was at the limit of its borrowing ability (Lindahl Dep. at 31–32). Thus, the shareholders concluded that they would have to sell at least part of their equity interest in Sonodyne (Lindahl Dep at 31–32).

During this period of financial uncertainty at Sonodyne, Duncan enlisted the aid of a variety of individuals and organizations in an effort to find a party interested in acquiring a portion of Sonodyne. In late 1982 or early 1983, Paul Cardinal, aware of Sonodyne's financial problems, put Sonodyne in touch with USFS, a wholly-owned subsidiary of Ashland Technologies, Inc. (Duncan Dep. at 37–38).

USFS began negotiating a possible acquisition of Sonodyne in early 1983. The ne-

gotiations continued throughout 1983 and into 1984 before culminating in the Purchase Agreement dated as of May 23, 1984. The Purchase Agreement provided for the transfer of 100% of the equity interest in Sonodyne from the Sonodyne shareholders to USFS in exchange for, inter alia, USFS's contribution of $941,200 to the capital of Sonodyne. Section 16 of the Purchase Agreement provides as follows:

(a) *Projections.* Stockholders have heretofore furnished to USFS certain projections of Sonodyne's future sales, expenses and capital requirements. Stockholders warrant and represent that the projections were prepared in good faith and represent Stockholders' best judgment as to the matters covered thereby. Stockholders make no other representation or warranty whatsoever with respect to the projections.

(b) *Additional USFS Investment.* USFS recognizes that Sonodyne may require capital in addition to the $941,200 to be contributed by USFS pursuant to this agreement in order to reach the profit levels set forth in the projections in the event Sonodyne's sales expenses or capital needs are not as projected by Stockholders. *"USFS shall have absolute discretion whether or not to provide additional financing to Sonodyne as capital, loans or otherwise."* (emphasis added).

Section 17 of the Purchase Agreement provides:

USFS shall not sell, transfer, assign or otherwise dispose of the capital stock of Sonodyne ("Stock") except in accordance with the provisions of this section.

. . . .

(c) *Offer to Stockholders.* USFS and its affiliates shall not sell less than all the stock. No sale shall be made without first offering the Stock to Stockholders at the price and on the terms, except as provided below, at which the Stock is to be sold to the prospective buyer.

(d) *Sale of Assets.* The sale, transfer, assignment or other disposition of a substantial portion of either the assets of Sonodyne or of the technology heretofore developed by Sonodyne ... shall be deemed a sale of the outstanding Stock by USFS for the purposes of this section.

Section 18(b) of the Purchase Agreement provides:

This agreement contains the entire agreement among the parties hereto and there are no agreements, representations or warranties which are not set forth herein. Except as stated above, all prior negotiations, agreements and understandings are superceded hereby.

In early 1985, Hosokawa Micron Corporation of Osaka, Japan acquired Ashland Technologies, Inc., USFS's parent company. USFS's name was subsequently changed to Hosokawa Micron (USA), Inc., and, as part of a recent corporate reorganization, merged into Hosokawa Micron International, Inc.

Beginning in early 1985 and continuing up until his termination in December of 1985, Duncan asserted to Hosokawa officials and others that Hosokawa was committed under the Purchase Agreement to provide Sonodyne with the funds to construct a new testing facility (Neiheisel Dep. at 115–117, 178). Hosokawa officials reviewed the Purchase Agreement and concluded that it did not support Duncan's claim. *Id.* at 184–185.

On December 3, 1985, Hosokawa instituted the present action for a declaratory judgment that it had fulfilled all of its obligation under the Purchase Agreement. Duncan counterclaimed against Hosokawa alleging breaches of the Agreement, and Hosokawa subsequently moved for summary judgment on all claims.

*Discussion*

Rule 56, Fed.R.Civ.P., provides that where "there is no genuine issue as to any material fact, the moving party is entitled to a judgment as a matter of law." *Knight v. U.S. Fire Insurance Company,* 804 F.2d 9, 11 (2d Cir.1986). In its affidavits and exhibits submitted to the Court, plaintiff has met its burden of demonstrating that there are no material facts in dispute and that it is entitled to summary judgment on the first issue raised by this motion. On the second issue, however, Duncan has suc-

cessfully demonstrated that there are material issues of fact which need to be resolved at trial.

The sole source of the legal relationship between Hosokawa and Duncan is the Purchase Agreement, which specified that it is to be interpreted according to Oregon law. Under Oregon law, the initial question for the Court to consider in a dispute involving provisions of a written contract is whether the relevant provisions are clear and unambiguous. *See Knox v. Hanson*, 242 Or. 114, 408 P.2d 76, 79 (1965); *Union City School Dist. v. Valley Inland Pacific Constructors, Inc.*, 59 Or.App. 602, 652 P.2d 349, 353 (1982). The question whether a given provision is clear and unambiguous is a question of law for the court. *Oakridge Cablevision, Inc. v. First Interstate Bank N.A.*, 65 Or.App. 640, 673 P.2d 532, 536 (1983); *Southwest Forest Industries, Inc. v. Vanply, Inc.*, 43 Or.App. 347, 602 P.2d 1113, 1117. If the contract provision is clear and unambiguous, parol evidence is inadmissible in construing the contract. *See, e.g., Andrews v. North Coast Development, Inc.*, 270 Or. 24, 526 P.2d 1009, 1012–13 (1974); *Union City School District, supra*, 59 Or.App. 602, 652 P.2d at 353; *Southwest Forest Industries, Inc., supra*, 43 Or.App. 347, 602 P.2d at 1117.

Only when the contract is ambiguous is a question presented for the trier of fact. *Id.* The Oregon courts have articulated a test to use in determining whether a particular contractual provision is ambiguous:

> A term is ambiguous if it has no definite significance or if it is capable of more than one sensible and reasonable interpretation. A term is unambiguous if its meaning is so clear to preclude doubt by a reasonable person.

*Oakridge Cablevision, Inc., supra*, 65 Or. App. 640, 673 P.2d at 536.

■ The first issue in dispute in this action is whether, under the Purchase Agreement, USFS obligated itself to fund Sonodyne beyond the $941,200 contribution specified in the Purchase Agreement. Under the unambiguous language of the Purchase Agreement, it is quite clear that Sonodyne had no such obligation.

Section 16 of the Purchase Agreement is entitled *"Projections; Additional USFS Investment."* The final sentence of Section 16(b) states that "USFS shall have absolute discretion whether or not to provide additional financing to Sonodyne as capital, loans or otherwise." If these words—"absolute discretion whether or not"—are not deemed to be clear and unambiguous, then no words ever could be. This is so particularly since these words are included in the portion of the Agreement entitled *"Projections; Additional USFS Investment."*

These words in Section 16(b) of the Agreement are "so clear as to preclude doubt by a reasonable person" that USFS or its successor in interest did not obligate itself in the Purchase Agreement to fund Sonodyne at any level beyond the initial capital contribution. *Oakridge Cablevision Inc., supra*, 673 P.2d at 536.

*Duncan's Counterclaim*

Duncan claims that the sale by Ashland Oil of 100% of the stock of Ashland Technologies Inc. (USFS's parent company) to Hosokawa Japan violated the right of first refusal contained in Section 17(c) of the Purchase Agreement. According to the affidavit of of Yasuo Okanoto, supplied by Hosakawa, the only transfer involved in the acquisition of USFS by Hosakawa from Ashland Technologies Inc. was that of USFS's stock. The stock of Sonodyne was not affected.

The court in *Engel v. Teleprompter Corp.*, 703 F.2d 127 (5th Cir.1983) was faced with a claim very similar to that of Duncan. In that case, stock subscription agreements in a closed corporation provided that if a stockholder planned to sell or otherwise dispose of his shares, the other shareholders had a right of first refusal on a pro rata basis. Through a series of complex transactions, 75% of the shares in the corporation were owned by a corporate entity which, in turn, was sold and became a wholly owned subsidiary of a third corporation. The parent corporation was subsequently acquired by a fourth corporation. Minority shareholders of the first corporation claimed that this series of transactions

entitled them to exercise their right of first refusal. The court found that none of these transactions constituted a sale or disposal of the first corporation's stock. The court noted that "transfer of the stock of a parent corporation does not affect the ownership of assets held by a subsidiary." *Id.* 703 F.2d at 134.

Duncan argues, however, that unlike *Engel*, subparagraph 17(d) of the Purchase Agreement makes it clear that the parties were attempting to deal not only with stock transfers, but with any corporate transaction that would detract from the comfort which the selling shareholders derived from the identity of the people on whom they had to rely for realization of the earnout which they were to receive for the original sale of their shares.

■ Viewing the terms of the Purchase Agreement in a light most favorable to the party opposing the motion for summary judgment, as the Court must do, I find that the terms are sufficiently ambiguous that a reasonable jury could find that subparagraph (d) carries the meaning ascribed to it by Duncan. Duncan correctly points out that in this situation, USFS could theoretically have spun off its other divisions and then itself have been sold as a shell holding Sonodyne's stock as its only asset. Under Hosokawa Micron's interpretation of the contract, relying on *Engel*, no right of first refusal would have arisen, yet the same effect as a sale of Sonodyne stock itself would have been achieved. It is unlikely that the parties intended this result to be permitted under the Purchase Agreement, yet according to Hosakawa's interpretation of the contract, it would be.

Since there is clearly a material issue of fact regarding the interpretation of Section 17 of the Purchase Agreement, summary judgment is denied on the question of whether Hosakawa breached its contractual duty by not offering Duncan the right of first refusal.

For the reasons outlined above, Hosokawa's motion for summary judgment is granted in part and denied in part. The trial on the remaining issues will be held on June 1, 1987.

So ordered.